```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
 2
    SOUTHCENTRAL FOUNDATION,       )
 3                                 )
              Plaintiff,           )
 4                                 )
         vs.                       )Case No. 3:17-cv-00018-JMK
 5                                 )
    ALASKA NATIVE TRIBAL HEALTH    )
 6  CONSORTIUM,                    )
                                   )
 7            Defendant.           )
    _____)
 8
                      TRANSCRIPT OF MOTION HEARING
 9      BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE
                      Friday - November 17, 2023
10                    1:00 p.m. - 2:33 p.m.
                        Anchorage, Alaska
11
    FOR THE PLAINTIFF:
12       Munger, Tolles & Olson, LLP
         BY:  WILLIAM D. TEMKO
13       BY:  NICHOLAS D. FRAM
         350 South Grand Avenue, Suite 500
14       Los Angeles, California 90071
         213-683-9266
15
         Cashion Gilmore & Lindemuth
16       BY:  JAHNA M. LINDEMUTH
         510 L Street, Suite 601
17       Anchorage, Alaska 99501
         907-222-7932
18
    FOR THE DEFENDANT:
19       Stoel Rives LLP
         BY:  WHITNEY A. BROWN
20       BY:  JAMES E. TORGERSON
         510 L Street, Suite 500
21       Anchorage, Alaska 99501
         907-277-1900
22   Clerk in attendance: Suzannette David
    _____
23                     STACY M. BALDWIN
                    Realtime Certified Reporter
24               Federal Official Court Reporter
                    222 West 7th Avenue, #4
25                    Anchorage, Alaska 99513
            Transcript Produced from the Stenographic Record
```

1          (Call to order of the Court at 1:00 p.m.)

2          DEPUTY CLERK:  All rise.  His Honor, the Court, the

3   United States District Court for the District of Alaska is now

4   in session with the Honorable Joshua M. Kindred presiding.

5   Please be seated.

6          Your Honor, we're on record in Case No.

7   3:17-cv-00018-JMK, *Southcentral Foundation versus Alaska Native*

8   *Tribal Health Consortium*.  Counsel, please state your

9   appearance for the record.

10          MR. FRAM:  Good afternoon, Your Honor.  Nicholas Fram

11   for Southcentral Foundation and my colleague Bill Temko and the

12   SCF board chair, Karen Caindec, here at the table.

13          THE COURT:  Good afternoon.

14          MR. TORGERSON:  Good afternoon, Your Honor.  Jim

15   Torgerson, Stole Rives, on behalf of ANTHC.  I'm joined here by

16   Kimberly Strong, who's the ANTHC board chair, and by Val

17   Davidson who is the ANTHC president and CEO.

18          THE COURT:  Good afternoon.  And thank you, Madam

19   Clerk.

20          So we're here for oral argument on, I guess a variety

21   of matters, but effectively a motion to enforce judgment.  I

22   was going to start I guess with a threshold question.  I wasn't

23   certain whether or not any portion of today's proceeding needed

24   to be conducted under seal, or to seal the courtroom.  I'll

25   refer to the parties as far as whether or not they believe

1    that's necessary.

2           MR. FRAM:  Your Honor, it certainly would allow for a

3    more fulsome oral argument.  So that we would be -- and we

4    would like to make sure that we honor ANTHC's request to keep

5    its confidential information confidential.  So if Your Honor's

6    inclined to allow that, that would be our preference.

7           THE COURT:  Mr. Torgerson.

8           MR. TORGERSON:  May I remain seated?

9           THE COURT:  Of course.

10          MR. TORGERSON:  So from ANTHC's perspective the relief

11   that SCF is seeking is significant in terms of changes to

12   ANTHC's governance.  Not the kind of thing that should be

13   debated or decided in secret.

14          So to the extent that the Court choses or would like

15   to hear about evidence -- sealed evidence rather than about the

16   governance changes, obviously if the Court wants to do that, we

17   do not oppose sealing any of those portions.  But we want our

18   portion to be public, and we'd ask that any discussion, other

19   than about sealed documents, be public as well, because this is

20   a matter of such importance.

21          THE COURT:  I agree with Mr. Torgerson's sentiment.  I

22   think perhaps maybe the prudent course of action is for us to

23   conduct the oral argument.  As we sort of reach the conclusion,

24   if either of the parties would like to offer any additional

25   commentary that needs to be under seal, we can seal the

 1    courtroom at the end and you can provide that commentary and

 2    that way the public is here and has access to the -- I guess,

 3    the heart of the argument.

 4         Does that work for you, Mr. Fram?

 5         MR. FRAM:  That's makes sense, Your Honor.

 6         THE COURT:  Mr. Torgerson, any objection?

 7         MR. TORGERSON:  No objection.

 8         THE COURT:  All right.  Very well.  So from, I guess,

 9    some preliminary matters, this is a case that obviously we've

10    spent years with a different judge, and I find myself here at

11    the end getting maybe some of the more difficult questions.

12    And, you know, it's something that actually happens more often

13    than you would think.  But it always puts me in the precarious

14    position where I fear that I will suffer, given my lack of

15    familiarity with what got us here, from some fatal

16    misunderstanding that will then compromise subsequent analysis.

17    Like wearing another man's pants and trying to find my car

18    keys.  That's the fear.

19         So if at any point in time during my questions, either

20    or both of the parties fear that I do suffer from any

21    misunderstanding, please let me know.  I'd much rather be right

22    and look like a fool.

23         That being said, I think what goes out is that there's

24    an expectation that each side will have approximately

25    20 minutes.  And much to madam clerk's disappointment, I don't

1    really care about the timeline.  I want to have a conversation
2    that is as lengthy as it needs to be.  I don't see oral
3    argument as a vehicle for which one party can vanquish the
4    other, as much as an opportunity for me to learn things that I
5    need to learn to get to the right answer.

6             So to that end, oral arguments tend to be a little
7    more conversational in this court.  And oftentimes I will be
8    asking questions that probably feel fairly elementary to the
9    parties, given their eminency to the facts and to the law.  But
10   they're not meant to be rhetorical.  They're not meant to be
11   sardonic.  I generally want to know.

12            With that being said, before the parties begin in
13   earnest, because I have no desire to be coy, I guess, I'd like
14   to provide at least the parties my initial thoughts so they
15   know which mistakes I'm contemplating making.

16            And I guess what I'd like to start with as the parties
17   begin their oral arguments is get an understanding of
18   hypothetically how this process should work under the umbrella
19   or through the prism of Judge Burgess's ruling.  You know, how
20   this is ideally supposed to work.  And then I think that begs
21   the question for each of the parties whether Judge Burgess's
22   order is tenable or workable.  Is there some fatal flaw to
23   its -- not the way it's drafted or the intellect behind the
24   order -- but in practice, if it's just, again, pragmatically
25   untenable.

1             And then, I guess the only other thoughts I would

2    offer, it seems to me that the crux of plaintiff's argument is

3    essentially that 5.4.1.7 can't be reconciled with Judge

4    Burgess's order.  My initial thought is I don't see anything

5    about providing a vehicle for the consortium to classify

6    information as highly sensitively -- highly sensitive and

7    confidential as being inviolate of the order.  But I do wonder

8    whether or not 5.4.1 itself is problematic and impossible to

9    reconcile with Judge Burgess's order.

10            And then finally, I guess, the question I would pose

11   to the parties -- I know Section 325 puts us in a different

12   prism, but it seems somewhat unorthodox to have what would

13   otherwise constitute fairly run-of-the-mill disagreements

14   amongst board members be resolved by a federal judge who is

15   neither intelligent about what -- ultimately asking the judge

16   to determine what is necessary is a fairly difficult

17   proposition and one that I think at least I might struggle

18   with, given my lack of familiarity with the day-to-day issues

19   that face the board and the various board members.

20            But nevertheless, that is how I would set this up.

21   And, again, I don't want the parties to worry too much about

22   time, as long as the conversation is fruitful.  I'll start

23   with, Mr. Fram.

24            MR. FRAM:  Thank you, Your Honor, may I go to the

25   podium?

1          THE COURT:  Whichever you prefer.

2          MR. FRAM:  Your Honor, I have a presentation.  I have

3     some slides I want to walk through.  I did want to start with

4     just some background, because as you pointed out, you're coming

5     to this sort of after the end almost of the litigation.  So I

6     thought maybe some brief background before we dive into the

7     questions that you posed might be the best way to go, because I

8     think you are understanding the issues correctly.

9          The issues as Southcentral Foundation sees it is that

10    ANTHC has a policy that on its face violates Judge Burgess's

11    order, because it can't be squared with what I call the

12    governance standard, the standard set out in the Ninth Circuit

13    and affirmed by Judge Burgess, that SCF is entitled to all

14    documents and information that are necessary for it to exercise

15    its governance and participation rights effectively.

16          That is a mouthful, so I'm going to use the governance

17    standard as the shorthand.  It doesn't mean we're trying to

18    change that standard, it's mostly for the court reporter's

19    sake.

20          So, one, ANTHC has that policy.  We think on its face,

21    because -- well, for reasons I'll get into -- violates Judge

22    Burgess's order; and two, it's an application.  We think that

23    ANTHC has withheld information using -- both using that policy

24    and using other standards that are not related to the

25    governance standard that is set out in the Ninth Circuit order

1    by Judge Burgess.  To withhold information about -- that that's

2    unquestionably governance information, because it's related to

3    the biggest governance crisis ANTHC ever faced.

4        So where I thought I'd start is with the key parts

5    from the Ninth Circuit decision.  Congress set up a structure

6    here -- and you're right; Section 325 is unique.  Congress set

7    up a structure here to provide state-wide health services in

8    which SCF and the other regional health entities govern ANTHC.

9    That's undisputed.  And it's undisputed that SCF as a regional

10   health entity has governance and participation rights in the

11   ANTHC and is entitled to all documents and information

12   necessary for it to exercise those rights effectively.

13       For SCF to do that it needs access to the same

14   information that its designated director -- because it does

15   that through its designated director on the board.  So SCF, in

16   order to exercise its governance rights, needs access to the

17   same information that its director has when she is in the

18   boardroom.  That's the only way that she can get timely

19   feedback and allow the organization to exercise the right

20   through her.

21       The Ninth Circuit gave pretty strong language here.

22   Right.  It said that the right would be a hollow promise

23   without the information necessary to exercise it effectively.

24   And it quite clearly put the designating entity, Southcentral

25   Foundation, sort of in the shoes of director -- the member of

 1   the board stands in the shoes of the designating entity around

 2   that table.

 3           On remand, Judge Burgess fleshed out the Ninth

 4   Circuit's order we think in three really important ways for the

 5   purposes of this motion.  First he affirmed that Section 325

 6   entitled SCF to all documents and information necessary to

 7   exercise its rights, what the Ninth Circuit said.  And he

 8   framed that -- he described that very strongly, right, that

 9   right includes information that is subject to the

10   attorney/client privilege.  That's unusual, Your Honor, to have

11   an information right that is that strong.  And he described it

12   as an absolute right, and the information that is necessary.

13           Second, and this doesn't really appear in ANTHC's

14   papers, but I think it's really important is that Judge Burgess

15   said that nothing in Section 325 would lead the Court to

16   conclude that the board, the ANTHC board, can limit or curtail

17   a designating entity Section 325 rights by consensus or

18   majority vote, right?  So if the information meets the

19   governance standard, Judge Burgess is saying that the board

20   cannot vote by majority to withhold that from the designating

21   entity.

22           THE COURT:  Mr. Fram, if I can ask sort of a practical

23   question, and I understand if you had I guess a systemic

24   approach like 5.4.1, that that could be problematic from Judge

25   Burgess's order.  But if you have a situation where only one

1  member believes that the documentation or information at the

2  core of the dispute is, again, we'll just call it necessary.

3          MR. FRAM:  Right.

4          THE COURT:  Is that itself enough to rise to the level

5  of inviting judicial sort of interference into the day-to-day

6  board proceedings?

7          MR. FRAM:  So we do not think that Judge Burgess set

8  up a system that would have the parties running back to court

9  every single time that that came up.  We do not think that

10 Judge Burgess set up a system where there would be frequent

11 disputes about what was necessary for governance.  And that's

12 for a couple of reasons.  One, we think the right is fairly

13 broad; and two, Judge Burgess was trying to resolve the

14 dispute.  Judge Burgess was not trying to set up a new dispute

15 resolution mechanism that would incline towards litigation.

16 And so that's why we think that the Court -- you know, when you

17 asked is the process workable, how should the process ideally

18 work.  We think, for the most part, any information that the

19 director receives in the course of exercising her board duties

20 at ANTHC, she should be able to share with her designating

21 entity.

22          And here's why.  Directors on the ANTHC board are

23 provided information for governance reasons.  That's the nature

24 of a board, right?  It makes governance decisions -- big

25 picture governance decision about how the consortium should be

1   run.

2         THE COURT: So all the information that she would

3   receive is therefore necessary, is that...?

4         MR. FRAM: So that is actually the default -- if you

5   look at 5.3 of -- and, Your Honor, I have a full copy of

6   Section 5, which is the policy on disclosure of information to

7   designated entities. I'm happy to hand that out if you would

8   like to see it.

9         THE COURT: I'm fine.

10         MR. FRAM: But if you look at Section 5.3 of that

11   policy. It's the general rule. And the general rule is that

12   directors may share with permitted recipients of their

13   designating entities all documents and information they receive

14   as a director. And it says, "subject to the limitations

15   below."

16         So the general rule -- and I think ANTHC even by the

17   body in its policy, even agrees -- is that yes the general rule

18   is that all information should be shared. And that's

19   important, because if the designating entity -- two things. If

20   the designating entity does not have all the information, then

21   it can't exercise its right fully. It's trying to provide

22   input and it's trying to explain -- you know, provide guidance

23   for the designating director what to do with one arm tied

24   behind its back.

25         We think that Congress was very clear that the

1  governance rights should belong to the entities for a couple of

2  reasons.  First, the entities as set out in some of the

3  legislative history, which is in the amicus brief.  You know,

4  we agree with the legislative -- in the amicus brief, we

5  featured that heavily in the first part of the case.  Congress

6  set up the system this way, because it was the originally held

7  entities that had the expertise that they can lend to ANTHC.

8  These regional health entities are managing -- were already

9  managing, continue to manage health care programs around the

10  state.  So it's the expertise of the entity that Congress

11  wanted to bring to bear in the ANTHC boardroom.

12          And second, this isn't disclosure in some sort of

13  public sense.  Any ANTHC confidential information that is

14  shared with Southcentral Foundation, the only people there who

15  can see it are people who have signed ANTHC's confidentiality

16  agreement.  So there are already strong provisions in there to

17  ensure that the information that is shared is kept

18  confidential.  So this sort of balance between transparency and

19  confidentiality really is a false dichotomy, because Congress

20  has decided that balance, you know, on the one end.  And two,

21  that confidentiality protections are still there.

22          So I can continue down on the background.  The only

23  last thing I was going to explain about Judge Burgess's order

24  is this portion at the end, which I think is really important,

25  because I think what you're going to hear later today is that

1    Judge Burgess somehow endorsed ANTHC's policies and said they

2    all confirmed to 325.  We don't think that's the case.  We

3    think there would be no reason to have this bolded section at

4    the end of the order if that were the case.  Judge Burgess

5    would have said something different.  He would have said, "and

6    all of the policies conformed with 325," but he didn't say

7    that.

8         The policy -- the argument I want to make today has

9    two components as I have previewed.  One, the policy that

10   violates on its face, and two is the application.  There's been

11   an application of that, that has deprived SCF of its

12   informational rights based on using standards besides the

13   governance standard.

14        You started it with 5.4.1, which I agree is the right

15   place to start, because 5.4.1.7 is a subset.

16        THE COURT:  But if there was an addendum to 5.4.1 that

17   simply, after "cannot be shared, unless necessary for

18   governance," would 5.4.1 then comport with Judge Burgess's

19   order?

20        MR. FRAM:  So if my client, if Southcentral

21   Foundation, got all the information -- and this is a broad

22   right and I do think Your Honor needs to flesh out to avoid us

23   coming back to court, you know, every single time there's a

24   question about this -- does need to flesh out some sort of

25   inner core of what information is within that right.

1          But if that's all that this permitted then that would

2    be okay.  But the problem with 5.4.1 versus .7 is that there's

3    no subject matter limitation for what can be withheld under

4    5.4.1.7.  There's no carve-out for information that is

5    necessary for governance.  And you see that in resolution

6    23-08.  And I can go through how that was applied in resolution

7    23-08, because what you see there is that a lot of information

8    was withheld -- and this is the second part of the argument --

9    a lot of information was withheld under 23-08 for reasons --

10   under 5.4.1 and for reasons other than the governance

11   standards.  All the information we seek indisputably meets the

12   governance standard, we think.  But they were applying other

13   standard, damaging, harmful, privilege, reasons they're not

14   allowed to use to withhold that information.

15          And I can get to that in a minute.  I mean, I think

16   we've mostly covered why we think that the policy on its face

17   violates Judge Burgess's order.  And it really is the fact that

18   there is no subject matter limitation to the kinds of

19   information that ANTHC can designate and then withhold.  And

20   this is an unfortunate application, because what -- and it

21   makes it too easy for ANTHC to withhold governance information.

22   All they have to do is designate it as HSCI and invoke to

23   withhold it, even though SCF has an absolute right to that

24   information.  ANTHC will say, well, Judge Burgess said our

25   policy is conformed.  We're withholding it under our policies.

1    Therefore, we can withhold it from you.

2           THE COURT:  And I agree that 5.4.1 or 5.4.1.7, given

3    the sense that it suggests an absolute sort of prohibition, is

4    difficult to reconcile with Judge Burgess's order.

5           But I sort of want to go back to, I guess, the

6    sentiment you expressed towards the beginning of your comments.

7    This idea that all information is sort of per se necessary for

8    governance.  And it seems if that were true then Judge Burgess

9    wouldn't have focused on that terminology or that qualifier in

10   the order.  Necessary seems like it must -- I think the only

11   conclusion you could draw is that there is some information

12   that isn't necessary for governance.

13          MR. FRAM:  Does ANTHC have information that would not

14   be necessary for SCF to exercise its governance right?

15   Absolutely.  Our point is that when that information is

16   provided to the board, it's provided to the board so the board

17   can make a governance decision with that information.  It's

18   provided so that the board can provide input or decision -- a

19   decision on the issue that comes to the board.  Right?  The

20   board is sitting at the top of the organization.  So the

21   information that filters up to the top of the organization is

22   the information that's needed for the board to make those

23   governance decisions.  And if the board needs that information

24   to make a governance decision, then we think the designating

25   entities should get that information too.  Because really what

 1  the board members are doing are exercising the governance
 2  rights of the designating entities.
 3       THE COURT:  So Southcentral's, I guess, fundamental
 4  position here is that if it is information that is shared with
 5  the board then it is per se necessary?
 6       MR. FRAM:  If -- well, yes, that's the core.  That's
 7  the inner bounds of this standard, is if it's shared with the
 8  board in a board packet or at a board meeting, right, for the
 9  board to make a decision, then it is within the information
10  that's necessary for governance.  That's why it's shared with
11  the board.  It's not the outer bounds.  There might be in other
12  situations.  There might be situations where, you know,
13  information is not shared with the board and Southcentral
14  Foundation requests it through its designated director, because
15  it thinks it needs it to help provide input through its
16  designating director.
17       We also don't want to set up a system that's sort of
18  easy to game, right, where ANTHC can just withhold information
19  from designating entities by simply just not providing it to
20  the board.  But we do think that if the information is provided
21  to the board so that board members can make an informed
22  decision, then the designating entities should have the same
23  right to make that same informed decision with the same
24  information.
25       THE COURT:  I guess my concern, Mr. Fram, is that if

1   that was Judge Burgess's intent it would have been a much

2   easier decision and order to write, any information shared is

3   therefore per se necessary.  It seems to me, at least the way

4   he drafted this and the discussion that preceded it, suggests

5   that there's any aspects of information that is discussed with

6   the board setting that isn't necessary for the board

7   governance.  And I have sat on boards before.  A lot of

8   information that's discussed isn't particularly necessary or

9   relevant.

10          But I guess to me it's hard for me to read Judge

11  Burgess's order as not indicating that there is sort of a

12  binary construct within a board meeting that some information

13  is necessary for governance and others not, for a variety of

14  reasons.  And so if the threshold question is, what is

15  necessary, and to the extent that Southcentral disputes that,

16  from a process standpoint, what happens next?

17          MR. FRAM:  All right.  Well, we would appreciate more

18  flesh on the bone here.  So appreciate a standard where that

19  does not have us coming back to court every single time there's

20  a disagreement over that.

21          THE COURT:  Well, I would like that too.  I guess,

22  what I'm wondering here is if that is the thrust of, I guess,

23  how you want this order to be read, it seems difficult not to

24  see it as a motion for reconsideration or a 60(b)(6) motion.

25  It seems that you want the order to say something that it

1   doesn't.  And maybe that's what Judge Burgess intended, but

2   it's hard for me to simply find the term necessary as

3   superfluous, given how often it is referenced in the order

4   itself.

5   MR. FRAM:  No.  And we are not arguing for a different

6   standard.  I just want to be very clear about that, because you

7   might hear that we are.  We're not arguing for a different

8   standard.  We think that -- what I've proposed is a workable

9   application of the existing standard, in fact, the core of the

10  existing standard.  And the reason, as I've explained a couple

11  times, is because information is provided to the board so the

12  board can make decisions using that information.  Because that

13  right actually belongs to the designating entity, the

14  designating entity needs that information too.

15  You asked why Judge Burgess didn't write the order

16  that way.  Frankly, I would be surprised if Judge Burgess

17  thought he was writing an order that was setting up a dispute

18  resolution mechanism that would have to be invoked three or

19  four times a year.  I would be surprised if Judge Burgess

20  thought he was writing an order where there would be frequent

21  disputes over what information is necessary for governance.  We

22  think, given the strong language from his opinion saying that

23  the ANTHC board cannot withhold governance information by a

24  majority vote, that it's an absolutely right from the Ninth

25  Circuit, depending how strong the informational rights are,

1    that Judge Burgess envisioned that it was a strong and broad

2    right.  It encompassed -- and information covered by

3    attorney/client privilege, which is very unusual.

4          THE COURT:  And I agree that that does appear in Judge

5    Burgess's order that it was a broad right.  I guess, I'm more

6    concerned about those times or those instances where one member

7    will think something is necessary and all the others will

8    disagree.

9          MR. FRAM:  Right.

10          THE COURT:  And essentially it seems like that's what

11    occurred here.

12          MR. FRAM:  Right.

13          THE COURT:  And so once that vote is taken, is the

14    natural next step to come over to the federal courthouse?

15          MR. FRAM:  Well, just to be clear, we don't think

16    that's exactly what happened here.  We think that the votes

17    that were taken were to withhold information based on some

18    other standard.  That's not the governance standard.

19          Yes, it is the next step to come over to the federal

20    courthouse, but that's why we think that we need more meat on

21    the bone of what Judge Burgess articulated.  Judge Burgess also

22    I thought -- well, in my reading of the order, he was

23    articulating a standard that he thought would be a little

24    easier to apply because of the broad nature of what was at

25    least of the core of that standard.

1          You know, 99, 95, 90 percent of information that
2    directors received he probably thought, yeah, that there's not
3    going to be a dispute about this because there are directors on
4    the board.  We're not talking about information lower-level
5    employees have, or other types of information that wouldn't
6    need to be presented to the board so that the board can make a
7    governance decision, based on -- you know, for the consortium.

8          So the reason I think -- you know, my interpretation
9    of the order why he didn't write it that way is because he
10   envisioned that most information that got to the board level
11   would meet that standard.

12         THE COURT:  But can you envision scenarios where there
13   could be discussion or information or documentation that was
14   prudent to discuss at the board level, but that the consortium
15   would have reason to not want shared beyond that, I guess, that
16   place?  And if so, if I were to read this order in the way that
17   you envision it, won't it have a chilling effect on the actual
18   communication that occurs at the board level?

19         MR. FRAM:  Your Honor, I don't think it will for a
20   couple of reasons.  One, Congress made this decision already
21   when it set up this structure.  So that really would be an
22   argument to Congress to change what the nature of the right the
23   designating entity has; and two, it's the confidentiality
24   agreements.

25         It's not like SCF's designated director can take

1  whatever information that is confidential from the ANTHC report
2  and disseminate that broadly.  It can only be discussed with a
3  certain limited universe of people who have signed
4  confidentiality agreements.  And that limited universe are
5  members of the SCF board, SCF officers, and legal counsel.  It
6  doesn't go beyond that.  So it's not a broad set of people who
7  are receiving that information.  It's a limited set and they
8  have all signed confidentiality agreements.  That should help
9  reduce any chilling effect.

10        Your Honor raised the question earlier that there
11  might be some information that comes to the board that is not
12  necessary for governance.  I don't know, information about an
13  HR issue with a mid-level employee, or private health
14  information -- you know, it's a healthcare organization, right,
15  so information protected by HIPAA or something else.  There are
16  provisions in 5.4.1 that makes that information not sharable
17  with designated entities.  Those are not being challenged.
18  That's not at all what happened here.  Those are not the kinds
19  of information that were withheld here.

20        So, yes, there are -- certainly there's --
21  specifically enumerated categories of information, which we
22  think is helpful, to limit sharing.  The problem is 5.4.1.7,
23  which is just this really broad standard list type of catchall.
24  Under which it's very easy for ANTHC to designate information
25  as HSCI and then say, well, this is an extraordinary

1  circumstance.  It can't be shared.

2         THE COURT:  So let me ask, I guess, in a different

3  way.  And, again, this is somewhat me displaying my ignorance

4  as to exactly what transpires at these meetings.  But if 13

5  members vote that it essentially isn't necessary for

6  governance, and one does, what would prompt such -- I guess

7  would warrant such a large majority of the board members

8  disagreeing with, I guess, plaintiffs here.

9         MR. FRAM:  Yeah.  I don't want to speculate on the

10  motivations, or sort of thought processes of board members who

11  are not essential board member.  They might have their own

12  reasons.  I'm not sure what those are.

13         But what we are talking about here, especially in the

14  application here, which we think is just, you know, a prime

15  example of a situation where -- that that is related to

16  governance.  All of the fallout from the former president and

17  chair of the board.  That occasioned a lot of conversations in

18  ANTHC about how to change, clean up the governing structure so

19  that wouldn't happen again.

20         To best do that -- to best have that conversation,

21  SCF's designated director should be able to consult with the

22  people at SCF who have expertise in dealing with not that exact

23  situation but similar type of governing situations.  That's

24  what Congress envisioned.

25         So SCF's designated director says, look, I'm getting a

1    lot of information about a situation that maybe I don't have

2    all the expertise about it and I want -- you know, she wanted

3    to be able to share with the people who did provide, or advice

4    of counsel.  Other directors they may feel they may be able to

5    handle it without having to share with their designating

6    entity.  We're not seeking to impose any sort of obligation on

7    other directors to share if they don't want to or if their

8    designating entity doesn't ask.  But in this situation, with

9    this magnitude of a governance crisis, she felt the prudent

10   thing to do was to share, get input from her board, get input

11   from legal counsel so she could provide the best way forward

12   for ANTHC.

13        And a big problem here is that the information --

14   while some information -- and I'm sure you'll hear a lot about

15   how much information was ultimately provided.  It was not

16   provided timely.  It was not provided in near real time to

17   allow her to have these conversations with Southcentral

18   Foundation in real time.  It was provided, you know, over a

19   year after the events that occurred -- over a year -- I'm

20   sorry -- over a year after the request was made.  Almost two

21   years after the events that were the subject of the governance

22   crisis, so to speak.

23        And we think that's an important component of this

24   too, right, the delay here -- as with many things, delaying

25   something is sometimes akin to denying the right.  While we

1  think the information is still important to get, A, there are

2  still ongoing issues that I can't talk about in open court; and

3  B, you know, one of the core functions of a board, right, is to

4  ensure that upper management is doing their job, right, to make

5  sure that upper management is following the rules, to make sure

6  that they're making the right decisions for the organization.

7        So seeing the same information that management is

8  having, understanding how they are making those decisions, to

9  see that, for example, the documents that were requested.  The

10  source documents that animated the investigation, right, to

11  understand that the investigators investigated the right

12  things, right, that's all documents and information that SCF

13  designated director would need to share with her board, with

14  her legal counsel, to get input on what the best course of

15  action for ANTHC is.

16        And that's why we think Your Honor carving out a

17  core -- you know, not changing the standard, but explaining

18  what the core of the standard is so that the parties are not

19  coming back to court all the time to ask you to make a

20  decision -- you or one of your colleagues to make a decision,

21  is we think the most workable way forward.

22        THE COURT:  Can you envision a scenario by which if

23  this were to play out again that your client would accept the

24  vote of the broader board as to whether or not information was

25  or was not necessary for governance?  Or is this Court going to

1  be sort of a silent board member that resolves any disputes of

2  this nature?

3  MR. FRAM:  I think the dispute resolution process that

4  Judge Burgess set up has this Court as a last resort in the

5  rare instance where there is a genuine dispute over what --

6  whether the information is necessary for governance.  I don't

7  know what other -- what other resort the designated director

8  would have.  And clearly in the order there was this dispute

9  resolution mechanism that was set out.  We're trying to figure

10  out a way forward so that we can avoid coming back to you all

11  the time.

12  THE COURT:  I notice that Judge Burgess set this up

13  and then immediately gave me the case, so I appreciate that.

14  MR. FRAM:  We did too.

15  So I was planning on going through resolution 23-08

16  and how to use all these different standards other that the

17  necessity standard.  Because really actually for this case -- I

18  appreciate that you're focused on how the governance standard

19  is going to be applied going forward.  I really think for this

20  case, you don't even get to that step because of the standards

21  that were used to withhold information were standards that were

22  not the necessity standard, right?  This is the title of the

23  resolution on the screen.  It doesn't say -- it doesn't have

24  anything to do with whether or not the information is necessary

25  for governance.  Now this is a recital in there that says the

1  standard that the boards uses whether it's information

2  necessary for governance, but when you get to the specific

3  responses -- to the specific requests -- excuse me -- you will

4  see that that standard is nowhere to be seen.

5        So, for example, I'm going to walk through three

6  examples.  And I just want to assure you, Your Honor, so before

7  the hearing, counsel for ANTHC, with a couple things redacted,

8  said that resolution 23-08 could be displayed publically.  So

9  this is all above board.  This is, you know, Exhibit 11 to the

10 Kyle declaration.

11       So this first -- this request, there were six

12 requests, and I'm going to go through three of them where there

13 is information withheld and explain to Your Honor why it was

14 withheld.  This first request was for a presentation by

15 Mr. Ide.  I can't talk about what Mr. Ide investigated.  But it

16 was -- you probably saw in the papers, it was something that

17 got to the core of ANTHC governance, information was withheld,

18 not because -- privileged information was withheld, not because

19 the board did any finding here, that it was not necessary for

20 governance, but because the scope of the disclosure was

21 damaging and they wanted to reduce -- supposedly reduce risk.

22       You know, there's no really real connection between

23 the governance standard and whether the information is damaging

24 or not.  Sometimes it's actually more important to share

25 information that could be damaging, because that's when, you

1  know, we think SCF's informational rights are really at an apex

2  is when you have a core governance crisis that has potentially

3  damaging information, because that's when it's going to be

4  needed to be handled with the greatest expertise and in the

5  most sensitive way.

6      The second one, this is -- the redactions are at

7  ANTHC's request and we're respecting them for purposes of the

8  portion here.  But SCF requested a presentation relating to

9  what's redacted and ANTHC said okay.  But Mr. Rymuth, the

10 outside counsel, is not authorized to disclose information at

11 all, if doing so could, in her view, create material risk to

12 ANTHC of...again, redacted.

13     Again, here it's even clearer that this is governance

14 information, the resolution says that the board accepts

15 Director Kyle -- that's Southcentral Foundation designated

16 director -- accepts her assertion that the disclosure may be

17 necessary for SCF to exercise its right.  But it says, even so

18 because this information could create some material risk to the

19 consortium, we're not going to allow it to be shared.  Again,

20 that's not using the governance standard right there.

21     And then third is the documents.  To this day the SCF

22 board has seen two documents.  One document that the ANTHC

23 board saw was withheld.  Another 14 documents that the ANTHC

24 board did not see.  Apparently, they made the decision that

25 they were not necessary for governance even though they didn't

1  see them, and that's in ANTHC's brief.  And then who knows how

2  many other documents were provided to variance investigators.

3  Source core documents that SCF's board should be able to see to

4  figure out if the investigators were doing the right thing.  If

5  they're investigating the right people, if they were getting to

6  the core of the problem to put ANTHC back on the right track.

7          So that's the end.  Unless the Court has more

8  questions, I'm happy to, in rebuttal, address anything that

9  comes up.

10          THE COURT:  I think that's good.  I might have more

11  questions, but I can address them during rebuttal.

12          MR. FRAM:  Thank you very much, Your Honor.

13          THE COURT:  Thank you, Mr. Fram.

14          MR. TORGERSON:  Let me get myself situated here,

15  please.

16          Good afternoon.  In addition to Ms. Strong and

17  Ms. Davidson, I also want to acknowledge that Director

18  Kaigelak, who is the ANTHC board treasurer and former board

19  chair from Nuiqsut, representing the Arctic Slope Native

20  Association is here, as well as Corina Ewan from Chitina,

21  representing the Unaffiliated Tribes.  Alonzo Leisholmn from

22  Metlakatla, representing Metlakatla Indian community, and

23  Francis Norman, director from Port graham representing

24  Chugachmiut.

25          And I will respond briefly to sort of the general

1  conversation.  But I think most of the issues that the Court

2  raised and that were addressed by counsel, comments that I had

3  in mind to address as well.  So if it's okay with the Court

4  I'll just reach those as I move forward?

5          THE COURT:  Of course.

6          MR. TORGERSON:  But of course, I'm here to answer your

7  questions.  So despite the fact that I have something in mind

8  to say, I want to respond to whatever your concerns are.

9          THE COURT:  Well, I'm curious as to Mr. Fram's sort of

10 suggestion that sort of naturally or intuitively if it's

11 something that's discussed with the board it is again the

12 assumption should be that it's necessary for governance.  And I

13 apologize, Mr. Torgerson, I think I may be somewhat ignorant as

14 to the tension between the consortium board and the respective

15 entities that might exist that could create reasons why the

16 discussion should stay solely within the board and not be

17 disseminated to the broader group.  But I really do, I think,

18 lack an understanding of what documents or what information may

19 be discussed at the board level that is important to the board,

20 but not necessary for governance from an individual members

21 standpoint, if that makes -- it's a very poorly worded

22 question, but if that makes sense.

23         MR. TORGERSON:  Yeah.  I think it's a really good

24 question and it touches on several things.  One is the

25 relationship between ANTHC and the consortium participants, the

1   13 regional health entities, and then all of the unaffiliated

2   tribes that have two representatives on the board.  And I want

3   to come back to that a little bit later, and I've got a chart

4   that I can show you that hopefully will be helpful as well.

5        Both because the relationship between the regional

6   health entities, as they're called in the statute, and tribal

7   health organizations as they're sometimes referred to, that

8   same thing, just to flag that for you.  The relationship

9   between the consortium and its participants is an important

10   relationship, and then the relationship between the various

11   regional health entities.  Which sometimes -- all of those

12   relationships sometimes have competition, as well as, of

13   course, a lot of collaboration and cooperation.

14        So understanding those relationships is important, and

15   the consortium is a unique entity.  Not overusing the word at

16   all.  As far as I know there's only one Section 325, and only

17   one organization that is set up exactly like the consortium.

18        So coming back to that a little bit later, but another

19   part of your question is about what necessary means.  And a key

20   part of defining it is to have in mind that it is a

21   determination in our view, it depends upon the perspective of

22   the director.  That is, as Section 325 states, ANTHC is

23   governed by its 15-member board of directors.  Now the Ninth

24   Circuit found in Section 325 an information right for the

25   designating entities.  The entities that designate directors.

So that's in 325.  But it says explicitly ANTHC is governed by
its 15-member board of directors.

So one thing that we ask the Court to be careful of is
to not take away from that 15-member board the sovereignty and
the responsibility for the governance of ANTHC, because from
ANTHC's standpoint, and I think you saw this from the amici as
well, there's a concern that's what's going on here.  That SCF
is trying to siphon off, to try to grab away some of the
powers, some of the responsibilities and sovereignty that the
board has.

So the notion that the test of necessity is based on
what the director thinks is necessary is really key, because
it's the director that is directly governing ANTHC.  And it's
the director who will know when the director -- excuse me --
needs to have the advice and consent -- or I should say the
advice and the guidance of their designated entity, or not --
pardon me.

And so that's why we have, as you heard here, one
director who wants a lot of information to go to her
designating entity and other directors who have not felt a need
to -- let me grab my water.

THE COURT:  Sure.

MR. TORGERSON:  -- have not felt a need to -- to
provide information to their designating entities because they
haven't felt like they needed that advice.

1          This notion is included in the existing disclosure

2     records and information policy, and I suspect is one of the

3     provisions that SCF is hoping would go away.  But 5.5.3 it

4     talks about director's duties regarding disclosure of protected

5     information, that's 5.5.  And 5.5.3 says, that the use of

6     confidential information -- so this is the information that has

7     been given to the designating entity -- the use of confidential

8     information is limited to the purpose of providing advice,

9     input, or expertise to the designating entity's director about

10    ANTHC governance.

11         So what you hear from SCF is that they have this sort

12    of omnivorous right to any information.  What the Ninth Circuit

13    said is that the designating entities have governance rights

14    that they exercise through their representative on the board.

15    And from ANTHC's perspective that means it's up to that

16    representative as to what information they need to give, they

17    want to give, to their designating entity to get the advice,

18    input or expertise of their designating entity to assist them

19    with an issue.

20         So I would say one answer to the question what's

21    necessary is, or what's not necessary, is anything where a

22    board member feels like they got it, any time when a board

23    member feels like they know how to deal with a particular

24    issue.  They're not looking for any advice, they're not looking

25    for any help.  It's two plus two, they know it's four.  They

 1    don't need to go and ask their board or the designating entity

 2    more about it.

 3            THE COURT:  So, Mr. Torgerson, won't it also vary from

 4    member to member as far as what they think is necessary to help

 5    them govern, and how do you resolve disputes if one member

 6    thinks this is necessary for governance?  I need to speak with

 7    a broader group versus, let's say, the other 13 who don't find

 8    is necessary.  Is it from your decision the director who makes

 9    the ultimate decision as to the necessary nature of the

10    information?  Or it is best resolved through the vote?  I'm

11    trying to figure out just, I guess, how it works when there is

12    a dispute as to who is or is not necessary.

13            MR. TORGERSON:  Yeah.  May I answer that question by

14    going to the governance policies?

15            THE COURT:  Sure.

16            MR. TORGERSON:  This means, I'm going to have to turn

17    this back on and try to make it work here.

18            Because there's an important piece of the governance

19    policies and perspective in the governance policies that's

20    missing here, and that is the structure of the policies.  And

21    I'm talking here about the bylaws and the code of conduct, and

22    then I'll get to the disclosure policy.

23            So, of course, as you know, within a corporation, and

24    ANTHC is a non-profit -- not-for-profit corporation.  Within a

25    corporation, sort of the top-level governing structure, the

1    top-level governance policies are bylaw.  And then you can have

2    different things that fall into that.  But for ANTHC's next

3    level down is code of conduct.  And then we have a disclosure

4    policy that actually talks about how to effectuate the

5    disclosure obligations that set out in the bylaws and the code

6    of conduct.

7            The bylaws, Article 2 Section C, state, information

8    provided to ANTHC's designating entities that subject to the

9    board's code of conduct and its policy on the disclosure of

10   records and information to designating entities each director

11   may provide or may ask ANTHC to provide the designating entity

12   the director represents with information and documents

13   necessary for the designating entity to effectively exercise

14   its governance and participation rights in the management of

15   ANTHC through its representatives on the board.

16           And then the code of conduct, which is effectuating

17   the bylaws says, 2.2.2.1, sharing information with the

18   designating entities, designating entities are entitled to all

19   documents and information they need to effectively exercise

20   their governance and participation rights.

21           Now I know your question was about sort of the

22   implementation, and I want to come to that next.  But just sort

23   of stepping back a bit, these representations that are being

24   made to you about the disclosure policy and about what 5.4 says

25   in terms of majority votes on this, or majority votes on that.

 1    They don't change this necessity standard.  They don't ever
 2    give the board the ability to step away from applying this
 3    standard.
 4         The bylaw says here's the standard you have to apply.
 5    The code of conduct says here's the standard you have to apply.
 6    So when you get to the disclosure policy -- which we'll go to
 7    next -- the question is about moving information between
 8    confidential or highly sensitive confidential, and moving it
 9    between the necessity standard being applied by one director or
10    having the necessity standard applied by the entire board.
11         I will get to your question about, well, what happens
12    if there's division within the board.  But important to
13    understand -- and this is why I would say to you that Judge
14    Burgess's order doesn't have internal inconsistency.  There
15    isn't a problem here like SCF is trying to persuade you that
16    there is, such that you need to actually change the existing
17    order or change the existing Ninth Circuit standard.
18         There isn't a problem.  Because ANTHC's bylaws state
19    what the necessity standard is in its code of conduct.  It
20    states what the necessity standard is.  And every time the
21    board, whether it's the entire board or an individual director,
22    makes a decision about disclosing information, confidential or
23    highly sensitive confidential information to a designating
24    entity, it's got to apply one of those standards -- or I should
25    say, it's got to apply that standard.  Whoever's applying has

1   got to apply that standard.

2          So going into the policy itself -- board policy

3   itself.  Again, the general rule, which counsel was talking

4   with you about, states that the consortium is committed to

5   providing designating entities with the information they need.

6   Once again, to effectively exercise the governance rights.

7   Accordingly, the directors may share with permitted recipients

8   of a designating entity all documents and information they

9   receive as a director.

10          So the default is a really big universe of documents.

11  That is the default is that directors can share everything they

12  received with their designating entity, except that that is

13  subject to the limitations and protections set out in Section

14  5.4.  What are those limitations and protections?  There are

15  two different categories of information that are protected

16  under 5.4 -- 5.42, which I'll mention just for completeness

17  that is not at issue here -- says that if any information is

18  shared with an executive session using special security

19  measures, which might mean documents handed out and you take it

20  back again, or it's showed on the screen and not handed out.

21  If there's any kind of special security measures in executive

22  session, then it's got to be shared the same way with the

23  permitted recipients of the designating entity.  So same -- not

24  more restrictive, but just as restrictive.  That's not at issue

25  here.

1           What's at issue is 5.4.1, which is the category that
2   creates highly sensitive confidential information.  And it's
3   true that 5.4.1, says that by a majority vote that unless
4   otherwise permitted documents won't be disclosed except by
5   majority vote.  I didn't say that very well.  The point being
6   that if it's an individual director who's making the decision,
7   they've got to be persuaded mostly that it's necessary or
8   they're not going to disclosure it.  If it's the full board,
9   most of the board have to be persuaded that it's necessary or
10  it's not going to be disclosed.
11          They're not voting -- that is the board -- may not
12  vote against disclosing something just by the majority vote,
13  but somebody's got to decide what's necessary.  And it's the
14  board, they decide that by a majority vote.
15          THE COURT:  So you would agree 5.4.1 is subservient to
16  the ultimate determine as to necessity, if the --
17          MR. TORGERSON:  Absolutely.
18          THE COURT:  Okay.
19          MR. TORGERSON:  This 5.4.1 is just saying here's how
20  it happens.  And if it's not -- if the information they're
21  talking about, the documents or information that went to a
22  director, do not fall under 5.4, they're not protected
23  information, then the director decides.  If they fall under
24  5.4.1 then the board decides.  How does the board decide?  The
25  board decides by a majority vote.  That's all it says.

1        THE COURT:  So what remedy is available if you are the

2    minority vote under 5.4.1, if you believe that this information

3    is necessary for governance?  And is the answer that we shall

4    hear it together?

5        MR. TORGERSON:  How Judge Burgess responded to that

6    question was to say such parties would have a right to go to

7    court.  So I am sure, given that he was concerned about the

8    cycle of litigation, that he would have rather the parties not

9    be in court.  I'm sure he would rather the parties not be in

10   court arguing about access to information involving a crisis

11   that happened two years ago, now two and a half years ago.  I'm

12   sure he would rather that the parties would move on.

13       But the remedy, if it's confidential, director gets to

14   decide if it's highly confidential, the board gets to decide if

15   there's a dispute, somebody wants to review either of those

16   decisions, the remedy that he described was to go to court.

17       THE COURT:  Just so I understand, that's really only a

18   remedy afforded because of Section 325?  If Section 325 didn't

19   exits there would be no mechanism by which you would go to

20   federal court and have a judge decide these disputes?

21       MR. TORGERSON:  I think that's right.  Section 325

22   doesn't say that outright.  Section 325 does provide an

23   information right to designating entities, as we've talked

24   about.  And there isn't another enforcement mechanism that

25   immediately comes to mind.  Judge Burgess has said the

1    enforcement mechanism that is available is to go to court.

2           But the point here -- let me just sort of finish this

3    off.  So 5.4.1.7, or 5417, doesn't provide the board with the

4    ability on a majority vote to deny a designating entity

5    information that's necessary either.

6           Section 5.4.1, as you know, has seven subsections.

7    Starts with privileged information, includes personal

8    information, it includes HIPAA protected and other kinds of

9    information, et cetera, information that one region has that's

10   private that other regions shouldn't have.  So it's six

11   enumerated categories of information that the ANTHC board said,

12   you know what, instead of delegating a decision about

13   necessity, instead of delegating that to an individual board

14   member we're going retain it.  That's the (b)(6).

15          And then it said, well, I'm sure we haven't thought

16   about everything here.  I'm sure there's something else out

17   there that is just as sensitive, so we're going to give

18   ourselves the ability to vote, by majority vote that it's also

19   equally sensitive, but it doesn't mean the information isn't

20   disclosed.  It just means that the board, rather than the

21   individual, is the party that's disclosing it.

22          I put together a chart -- very complicated -- to try

23   to demonstrate this.  That is looking just at confidential and

24   highly sensitive confidential information.  If it's not

25   confidential it's in a different world.  But just those two

1  categories.  If it's confidential, single director; if it's
2  highly sensitive, full board.

3          In both instances we understand that an appeal would
4  go to the Court, but everybody, including the Court, has to
5  apply the same Ninth Circuit necessity standard, information
6  and documents necessary.  And I won't say the whole thing all
7  over again.

8          THE COURT:  Mr. Torgerson, if I may ask -- and again,
9  I may just not understand the nuances -- but if a board member
10  indicates they believe -- he or she believes that this is
11  necessary for governance purposes, wouldn't it be a much more
12  practical and I guess simple procedural to say, well, if they
13  believe it's necessarily then we'll provide them
14  the information?

15          I'm trying to figure out I guess what is the
16  reluctance to do so, or what are the negative externalities of
17  doing so?

18          MR. TORGERSON:  Yeah.

19          THE COURT:  Which I recognize isn't a legal question,
20  I'm just curious.

21          MR. TORGERSON:  Yeah.  I think that the answer
22  probably involves a couple of different pieces.  One is that --
23  excuse me -- ANTHC is unique.  It's the only -- its boardroom
24  is the only place in the state -- the only place in the
25  universe where the fiduciaries come together with an obligation

1   to make decisions about resource allocation, et cetera, with an

2   eye towards state-wide provision of services.

3         Everybody in the room, of course, cares about

4   state-wide services, but everybody in the room also has their

5   own region, has their own oracle for the unaffiliated tribes,

6   has their own area.  So everybody else is collaboration,

7   cooperation, but also competition.  That boardroom is

8   sacrosanct, because it's the one place where everybody has to

9   come together with the state-wide perspective.

10         And I think the reason you hear from the amici -- and

11   I'll let them speak for themselves -- is because of the concern

12   that that protected space is endangered by the changes that SCF

13   is seeking here.  So that's the first thing.

14         The second thing is to understand -- and I'm going to

15   slip to another view here -- to understand -- back to the

16   structure of ANTHC.  It's got lots of participants.  It's got

17   the 13 regional health entities, which all have their own

18   number of tribes and then it has the 60 unaffiliated tribes

19   that are represented by two people, including Ms. Ewan on the

20   board.  It's a complicated organization involving a lot of

21   different entities.

22         And here's the thing, Southcentral Foundation is

23   different from the others.  It's different, not because it

24   cares about ANTHC's governance, not because it cares about

25   ANTHC's success.  They all care about that.  It's different

1 because it shares a campus, because it shares revenue sharing

2 agreements, because of its proximity in this community next

3 door.  It has conflicts.  It has conflicts of interest.  It has

4 financial conflicts of interest.  It has an interest in ANTHC

5 that is different than all the others.  And an interest is a

6 reason for it to want to have more information than these

7 others feel like they need.  And it's not an interest that's

8 aligned with ANTHC's best success and well-being.  It's aligned

9 with SCF's best success and well-being.

10    So the concern here is how do you both make sure that

11 ANTHC succeeds, because in truth 325 is about ANTHC.

12 Information disclosure under 325 is about ANTHC's success.

13 That should always be the North Star here.  How do you make

14 sure that ANTHC is protected, and at the same time make sure

15 that SCF and the other designating entities get the information

16 that they are entitled to have.  So that they can provide good

17 governance to impose as well.

18    THE COURT:  So I'm trying to understand.  Is there,

19 let's say again, hypothetically there's information that

20 plaintiffs say is necessary for governance.  Is the concern

21 here that it may be necessary for governance, but it may also,

22 I guess, provide or inflame the tensions between the

23 individuals as a whole?  Or is the idea here that plaintiffs

24 are arguing that something is necessary for governance, but

25 that's mere subterfuge for information they want for their own

1    personal endeavors -- or individual endeavors as opposed to

2    what is best for the whole?

3            MR. TORGERSON:  Yeah.  I, just like opposing counsel,

4    want to be careful about getting into motives.

5            THE COURT:  Right.

6            MR. TORGERSON:  But I would just point out that there

7    are these differences in perspectives.  There are these

8    differences in agendas.  These differences in interest that can

9    help explain why there would be a difference in perspective

10   here.  But I also want to push back a bit on the question, to

11   the extent that from ANTHC's standpoint, it's not one you have

12   to get to.

13           And by that I mean -- I if may, by that I mean that

14   the Ninth Circuit has already set the necessity standard.  It's

15   already said here's what it is.  And it's necessary for

16   governance and participation rights, exercised through the

17   representative, it's already said it.  And what SCF is doing is

18   trying to get you to change it.  And the Ninth Circuit hasn't

19   set the question of who makes these decisions, who applies the

20   standard, but Judge Burgess has.  And his decision, it's way

21   too late for a motion for reconsideration or Rule 60 motion.

22           So if I can show you another one of my slides here.

23   This is -- the black print is the first paragraph of the order

24   that Judge Burgess entered back in July of 2022.  When I say

25   the first paragraph of the order, the very end of the order.

 1   He had three paragraphs -- ordered paragraphs.  And the
 2   language that's in black is the language that's in his order.
 3   And I've tracked changes to put what I understand SCF's
 4   proposal to be, how it would change the existing order.  It
 5   would change, "necessary for SCF to exercise effectively its
 6   governance and participation rights in ANTHC," which of course,
 7   is not language that's in Judge Burgess's order, but it's
 8   language that was negotiated by the parties.  It's the language
 9   that's in the partial final judgment.  The language to which
10   SCF had agreed to and said that it was in conformance, language
11   that its -- anyway.

12          All right.  So replacing that language with governance
13   related, which is something different.  That's for sure.  It
14   sure seems like it becomes less tied to ANTHC's governance
15   needs.  New standard, replacing the Ninth Circuit standard with
16   one that SCF is asking you to use.  And then at the end, based
17   on reading their order, I understand them to be asking that any
18   policy that would limit SCF's designated director from giving
19   SCF any governance-related documents -- any documents and
20   information that has been shared with the board, and any
21   documents and information that she needs related to any issue
22   that has come before the ANTHC board, violates Section 325 and
23   shall be amended.  That's what I understand the proposed order
24   to be.

25          So, again, responding to sort of the general direction

1   of some of your questions.  This is too late.  This has been

2   decided.  It's not too late to actually apply the standard but

3   it's too late to change it.  It's the wrong time to change it.

4   When I say it's not too late to apply the standard, I want to

5   make the point here that the Ninth Circuit's necessity

6   standard, it's never been applied.  It was announced in a

7   standing decision.  The Ninth Circuit said, yes, SCF, you have

8   standing because you have this right.  And I'm not saying that

9   it's less of a right because it was announced in the standing,

10  but it wasn't anchored to any facts.  Judge Burgess didn't

11  anchor to any facts, because it's been pointed out several

12  times in his decision.  SCF didn't ask him to apply to any

13  facts.

14          So the first time anybody that's ever applied it at

15  all, the first time ANTHC has had a chance to apply it was in

16  February.  And it did that without any case studies, if you

17  will.  I mean, there are a lot of other information sharing --

18  a lot of other information rights, right?  I mean, people have

19  FOIA information rights, people -- in discovery people have

20  rights to information and directors have rights to information

21  and shareholders have rights to information.  Those get

22  applied.  They're very fact specific.  All the relative

23  interests are being brought into effect.

24          Never happened.  Here it's happened for the first

25  time.  And the response from SCF is not to say, well, wait a

second.  We want you to take a look at this particular
decision, here's all the evidence about it.  And ANTHC can
provide all the evidence about it and you would supply it.  And
it would have the first judicial application ever.  That's not
what they've done.  They've instead skated past all of that and
immediately asked you to start changing these standards.

THE COURT:  Mr. Torgerson, Mr. Fram had listed -- and
this is contained in the briefing as well -- but these examples
of the board's response to these requests.  And what's
implicit, and perhaps may be argued explicit, is that the board
is acknowledging that the information at the core of the
request is necessary, but is not willing to provide it due --
to offer some protection to the board itself -- or sorry -- to
the consortium.

And it seems to me that if everything is subservient
to the necessity of standard, I don't know how to reconcile
that tension, and that's what prompted my earlier question.  If
there are times where plaintiffs think this information is
necessary to govern, and arguably it is, but providing that
information could be damaging to the consortium.  Which it
appears to be this is an example of, where does the Court go
given Judge Burgess's ruling?  Wouldn't it suggest that it
doesn't matter if it was damaging to the consortium has to be
provided, does that make sense?

MR. TORGERSON:  Yeah, it does.  And I think it's --

1   the reason that if SCF really wants to -- really wants some

2   such information that it needs to be applied.  It is -- again,

3   these are factually intensive questions and the facts matter

4   and the Court doesn't have them here.

5           What I think the Court shouldn't do is start changing

6   the standards.  But what's going to happen when it gets

7   applied?  I think they're hard questions.  You know, on the one

8   hand if you have -- so, first of all, I'd say that very few of

9   the informational standards are absolute.  And given that

10  ANTHC -- Section 325 is created for ANTHC and ANTHC's success,

11  it's hard to believe that it would be and should be interpreted

12  in a way that would harm ANTHC.

13          So if you're in a situation, hypothetically, where the

14  information that's being sought involves something that

15  happened two years ago or two and a half years ago, and the

16  board has dealt with it and the board has moved on, it's not an

17  issue in front of the board anymore, but some entity and some

18  director wants to have that information provided to the entity.

19  And the release of the information itself, because it's

20  privileged and because there's some restriction on its release,

21  because there's some law that says it shouldn't be released.

22  The release itself would harm ANTHC.  That's a hard thing for

23  ANTHC to say, oh, we think we better harm ourselves for

24  something that, even though it may be a colorable argument that

25  it's necessary, it's really, really a stretch.

1          That's why I say this is factually intensive.  What

2     exactly are the balances here?  Because it's true that in

3     announcing the decision, the Ninth Circuit didn't put

4     limitations on it.  It's true that in addressing the

5     situation -- the standard that Judge Burgess didn't put limits

6     on it, but nobody's applied it.  And I don't think that the

7     record supports the notion that it's the one standard in the

8     entire world that has no limits on it.

9          And I would also say, if I could, that SCF's position

10    seems to recognize that.  Because if you recall what counsel

11    said and you look at the papers, when they're talking about

12    5.4.1 -- did I get my points right here?

13          THE COURT:  I believe so, yes.

14          MR. TORGERSON:  Yeah.  5.4.1.  So, again, there are

15    these seven subcategories, right?  And what they say is, well,

16    we don't want that HIPAA stuff.  I think that's three or four.

17    We don't really want the information about other, other

18    regions.  And I think that a declaration from the designated

19    director said I'm not really interested in sort of 2, 3, 4, and

20    5 -- I might have this slightly wrong -- but the point is that

21    even SCF recognizes that there's some information that even if

22    the board looks at it, even if it might meet the definition of

23    necessary, they recognize at least for purposes of argument

24    that they're not going to claim that they have it.

25          That's what we're talking about here.  When this

1  standard actually gets applied, it needs to be applied to real

2  facts and there must be some balance and some realism so that

3  ANTHC isn't forced into harming itself.

4         THE COURT:  So, Mr. Torgerson, if I looked at this, I

5  looked at the facts and I agreed with your sentiments that,

6  while this information may be necessary for governance, there

7  may be legitimate reasons, you know, the protection of the

8  consortium itself that would warrant nondisclosure, doesn't

9  that also require me to effectively reconsider or modify Judge

10 Burgess's order to create that exception?  Because the way I

11 read Judge Burgess's order, as well the Ninth Circuit, it feels

12 very absolute.  Once that necessity determination is made

13 there's no more analysis to be conducted.

14        And I guess that's why I ask the question.  It wasn't

15 to put the spotlight on Judge Burgess's order, but it seems

16 given my -- I'm certain -- not fully educated mind, almost

17 impossible for it to work and practice absent some

18 modification?  And I recognize neither party has officially

19 asked me to reconsider or filed a 60(b)(6).  But to have the

20 relief that you're requesting seems to me that I would have to

21 build in a caveat to Judge Burgess's order?

22        MR. TORGERSON:  So ANTHC is not asking for any relief,

23 except that the cross motion we filed --

24        MR. FRAM:  We'll take that concession.  Thank you.

25        MR. TORGERSON:  Except that the cross motion that we

1    filed be granted.

2         But what I would say more, maybe more substantively,

3    is that we're not asking that the Court make changes to the

4    existing order that was entered by Judge Burgess, and we're not

5    asking the Court to make changes to the Ninth Circuit's

6    decision.  What we're asking regarding the relief that the --

7    the relief that SCF is seeking, to the extent that relief is

8    focused on disclosure documents rather than policy changes --

9    what we're asking is the Court deny it on the grounds that it's

10   not properly before it.  That is, the Court's had

11   administrative appeals, knows what they look like.  When

12   there's an administrative appeal, you don't just give the

13   party -- the adjudicator who's reviewing the matter, you don't

14   just give them the decision that was entered by the lower body,

15   and then pick out a few quotes from it that you think are

16   problematic.  And say, okay, decide whether this was correctly

17   done.  That's not a fair presentation for the Court to review

18   something.  And that's what was done here and it's not

19   sufficient.

20        So what ANTHC would ask would be that that part of the

21   relief they're seeking be denied on that basis.  They haven't

22   properly brought it before the Court.  A decision of the board,

23   in which the board can understand, not only the decision

24   document, but the basis for it.

25        If, for instance, the board decided that certain

1   information shouldn't be disclosed in a certain forum, because

2   it had been provided in another forum.  That's not before the

3   Court to -- just don't know enough about it.  So as to this

4   specific request in this amici we would recommend doing.

5           As to the broader question, well, what does this look

6   like going forward, if at some point there is a properly

7   presented issue, then it would -- it could be applied and it

8   could be adjudicated in a fact setting.  Again, we've got two

9   prior orders that have no tethering to any facts.

10          If there's going to be further development of this,

11  just like is true for other standards, the standards for what

12  information directors get, the proper purpose standard for what

13  shareholders get, it needs to be tethered to facts.  And at

14  that point, the question the Court asks I think would be

15  appropriate to sort through, but not now.

16          THE COURT:  I guess my only last question is, if we

17  got to a position where this Court is making these

18  determinations, I guess, you know, is the Court ill-suited or

19  ill-designed to be able to speak intelligently about what may

20  be necessary for -- I mean, as an academic construct I can

21  understand it.  But to truly understand what may be necessary

22  to Southcentral as far as governance is concerned, you know, am

23  I not forced to defer, I guess, a great deal to their

24  articulation for why it's necessary?

25          I mean, I guess, that's what I struggle with.  It just

1   feels like I'm not in a great position to disagree as to

2   necessary for governance given my lack of familiarity with the

3   day-to-day, you know, aspects of their operation and what may

4   or may not be important or necessary.  But perhaps that's just

5   my lot in life and I shouldn't complain.

6           MR. TORGERSON:  The way I would expect the question to

7   be presented is that there would be some information and the

8   designated director would say as to -- there's some information

9   that the board is considering, I need to get this information

10  to my designating entity so I can have my designating entity

11  look at this information and provide me their feedback, provide

12  me their advice, et cetera.

13          And then I think in that context, whether that's

14  necessary or not, could depend on, is that issue in fact in

15  front of the board?  Has the board already decided that issue?

16  Things like that.  That are -- they may not be completely clean

17  cut, because the rest of the board if they said, no, we don't

18  think it's necessary and they may have one view on it, a

19  particular board member may have a different view about what's

20  going to be in front of the board.  But I think there are those

21  kinds of questions that are often the crux here that the Court

22  could deal with like it deals with other evidentiary questions.

23          THE COURT:  Thank you.

24          MR. TORGERSON:  And when you say that you got one last

25  question, I sort of take that as a notion that I should be done

1   as well.  Let me look and see --

2           THE COURT:  No, if there's anything else you would

3   like to add.

4           MR. TORGERSON:  If I could, one point that I'd like to

5   make in response to my counsel.  And that is about the

6   timeliness of ANTHC's response.  I know this isn't the central

7   point, but it's an important point.  Because there was, as I

8   counted, about a 70-week delay.  70-week delay between when

9   ANTHC passed its policy about how a board member who wanted to

10  provide information to their designating entity that was highly

11  sensitive confidential information, how they would go about

12  doing it.  That it's asking the board for permission.

13          70 weeks later before SCF's designated director made a

14  request as a director motion to the board.  Two weeks after

15  that motion was made and considered, the ANTHC board -- I'm

16  sorry.  Two weeks after that motion was made the board met and

17  largely approved her request.

18          So when SCF talks about delay, this was a delay of

19  their creation.  And, again, it was from ANTHC's perspective

20  created in an attempt to try to build a record for today.

21  We've been working towards this day from quite some time from

22  ANTHC's perspective.  Thank you.

23          THE COURT:  Thank you, Mr. Torgerson.

24          MR. FRAM:  Your Honor, if I may, just a few points on

25  rebuttal.

1        THE COURT:  Sure.

2        MR. FRAM:  First on the delay point.  The request was

3 first made in January 2022.  For months ANTHC represented --

4 and this is all in the papers that I was working on it -- never

5 asked SCF to go -- to make the request in some other way or use

6 some other magic words.  That's a post-hoc justification, the

7 sequence is in the papers.  I won't walk Your Honor through it.

8        You asked about the negative externalities.  And you

9 heard things about conflicts and confidentiality and SCF trying

10 to change the balance of power.  I think all of those are red

11 herrings.  SCF is not trying to undo the conflict of interest

12 rules.  If the information is information where SCF has a

13 conflict, SCF's designated director will not get that

14 information in the first place so there'll be nothing to pass

15 along.  This is not about confidentiality.  Anyone at SCF who

16 would have received the information has signed a

17 confidentiality agreement.

18        And this is not about changing the balance of power.

19 At the end of the day SCF has one seat on the board and one

20 voice in that boardroom.  So there's no way that SCF by virtue

21 of having, you know, brought more information because it asked

22 for it, than other designating entities would have more of a

23 say in the governance of the consortium.

24        I think we heard something -- and much of the

25 conversation focused around the governance standard.  And I

think I heard counsel say that, you know, it is subjective and
each director does have to make their own decision about what
is necessary.  And I would suggest that that's right.  And
that's because the right belongs to the regional health entity,
in the first instance exercised through their director.  So the
director gets to make that decision about what is necessary.
And what we have here is the board trying to take that right
away from the director, trying to wrestle it away.  And I think
there's just nothing in Judge Burgess's order or the Ninth
Circuit opinion, that lets the board take that right away from
the regional health entity through their designating director.
Because at the end of the day it is a right.  A right is an
entitlement.  And if you have to ask the person, you have to
ask somebody else for permission to exercise that right, it
ceases to become a right.  That is sort of a benefit.  Right?
And that's not what this is.  Nothing in Section 325, says that
the right to the information is benefit.  It's a right that the
designating entity has so that they can exercise its rights to
govern ANTHC.

          SCF is not trying to change the standard.  SCF is
trying to articulate the core of the order to avoid having to
come back.  You know, because on the institutional concerns you
raised.  But at the end of the day, because the right is a
right given to Southcentral Foundation.  Under federal law,
this is the place where rights under federal law are

 1  adjudicated.  This would be the forum where it would have to be

 2  decided.

 3          But, again, if there's more meat put onto the bone of

 4  what the core of the necessity standard is, I think we can

 5  avoid a lot of coming back to court.

 6          THE COURT:  What about Mr. Torgerson's point that to

 7  properly be in front of the Court, it can't be as simple as we

 8  requested this information.  We believe it necessary.  We

 9  didn't provide it.  You know, how do you envision the Court's

10  analysis and what information or what factors would play into

11  this Court making individual determinations as to -- necessary

12  for governance?

13          MR. FRAM:  Well, first, that is not this motion, and

14  that is not this case.  Because this motion is about having a

15  policy that violates the order, because the standard in the

16  policy prohibits withholding information in a way that's not

17  tethered at all to the necessity standard, one.  And two,

18  information is being withheld for other reasons, different than

19  the necessity standard.

20          Now if Your Honor felt that Your Honor needed to apply

21  the necessity standard, because that was the information that

22  information was withheld, I think a good place to start would

23  be with looking at the information that was withheld.

24          In ANTHC's opposition brief it pointed out that the

25  Court could look at the information in camera.  We're fine if

the Court wants to look at the information in camera. This is
different than in the Daverage (phonetic) case though, because
we don't have the information. We can't provide it to you to
look at in camera. That's the whole point. ANTHC would have
to provide it to you.

So any suggestion that we need to provide you with the
information that -- for you to decide whether it's necessary or
not, that's just an unrealistic and unworkable standard,
because that's information that we don't have.

THE COURT: What about the tension Mr. Torgerson
discussed, about this idea that while the circuit and Judge
Burgess focused solely on this idea of information necessary
for governance, that there could be a scenario by which an
individual could claim that it's necessary for governance but
the recognition is that by sharing that information it damages
the consortium itself? Shouldn't Section 325 provide some
protection if the endeavor is the well-being of the consortium?
Given Judge Burgess's order, does it matter at all, if I were
to look through this information and think I understand the
reason and the rationale behind not disclosing this
information, but if I also determine it was necessary for
governance, does it matter?

MR. FRAM: Your Honor, if it's necessary for
governance we don't think that the board or anybody else has
discretion to withhold that. And that's just a decision that

1    Congress has already made and that the Ninth Circuit has

2    already interpreted in Section 325.  But I just want to assure

3    you that the negative externalities that were mooted earlier in

4    the argument; conflicts, confidentiality, power grab.  Those

5    are not genuine concerns.

6         If there's a conflict of interest, as they point out

7    in their brief on page 5, SCF declares its conflicts of

8    interest.  There's no dispute that SCF declares conflicts of

9    interest when it has an actual conflict of interest.

10        Confidentiality, there's no dispute.  SCF was not

11   trying to share the information with any broader universe of

12   people than those who have signed confidentiality agreements.

13   Confidentiality agreements ANTHC has drafted and agreed to keep

14   that information confidential.  And at the end of the day, SCF

15   can't use that information for anything else, other than to

16   give input to its designating director, so she can exercise her

17   voice and vote in the boardroom.  It can't use that information

18   to take over ANTHC.

19        THE COURT:  But given the vote of the board wouldn't

20   it suggest a genuine concern that the other members have about

21   sharing this information with your clients?

22        MR. FRAM:  Well, I think a historical example is

23   perhaps appropriate here.  So the reason this case was brought

24   in 2017 was because the board voted to delegate all the full

25   power of the board to an executive committee, five-person

committee.  And the board was also voting to specifically

withhold information.  For example, the employment contract

with the former president and chair.  The board voted to allow

the executive committee to consider it and the board didn't

even want to see it.

So SCF, because it thought it had governance rights

and informational rights in ANTHC, rights that are vindicated

by the Ninth Circuit, brought this lawsuit.  The Ninth Circuit

agreed.  So I resist a little bit the idea that there have not

been applications of this in the past.  There was a very

specific application in the complaint that Your Honor can read

about in the Ninth Circuit's decision.  And that Judge Burgess

in his order specifically said did violate Section 325.  The

delegation of the authority of the executive committee did

violate it.

And what we're trying to prevent in the future is a

repeat of what's happened in the past.  So we're trying to

prevent in the future the board making a decision like

delegating its full power to a small group of people, or voting

to not look at certain information.  And we really think that

the Ninth Circuit and Judge Burgess have agreed with us on

those points.  Because the right belongs to Southcentral

Foundation, the board cannot vote to take those rights away.

And unless the Court has further questions, I can end

at that.

1        THE COURT:  I don't believe I do.  Thank you very

2  much.

3        MR. FRAM:  Thank you, Your Honor.

4        THE COURT:  Are you looking at me expectedly?

5        MR. TORGERSON:  If I'm allowed to respond, I will.

6  But if I'm not, then I will sit.

7        THE COURT:  I have a few more minutes, if you would

8  like to respond.

9        MR. TORGERSON:  I'll be very brief.  Just a couple of

10  relatively narrow points.  This notion that SCF wouldn't be

11  able to participate in the process of like an in camera review

12  process because it doesn't have the information.  Again, there

13  are information -- there are disputes about information that

14  happen all the time.  They happen in FOIA, they happen in

15  discovery disputes.  And one party obviously has the

16  information, the other party doesn't.  And the party who

17  doesn't have it, doesn't necessarily know what it is but they

18  can still know enough about it so they can say here's what

19  needs to be reviewed.  This is not inventing some new process.

20  So the notion because it doesn't have the information, there's

21  no way to work through this.  It just doesn't hold water.

22        In addition to which, the person who is making the

23  actual decision about whether information needs to be disclosed

24  is the designated director who knows all of the information.

25  So unlike the usual situation where there truly is one party

1     that doesn't have access to the information, here that's not

2     the case.

3           Second, the conflicts issue is just another example of

4     taking away the board's authority, because ultimately the

5     responsibility for conflicts is a board responsibility.  That

6     is, board members have an obligation to identify and report out

7     their conflicts when they have them, but they don't get to make

8     the final call.  They cannot report a conflict, even though

9     they have one, and the fact that they haven't reported one

10    isn't the end of the story.  It's up to the board to ultimately

11    decide whether there's a conflict.  So giving this issue away

12    by just saying, well, our board member will take care it.  Like

13    I said, it's taking another issue away from the board.

14          In confidentiality, with all due respect, when the

15    primary concern in some instances is about a particular

16    consortium member's access to the information, not that they're

17    going to disclose it to somebody else, but that they're going

18    to have the information.  Having confidentiality agreements in

19    place doesn't really resolve that.

20          So I will just end by saying, the concern here is the

21    concern expressed by the amici, which is that the governance

22    policies that are in place, negotiated after the litigation,

23    after the Court's decisions, represent the right balance.  And

24    we ask the Court to resist those, because of the potential bad

25    effect it could have on ANTHC's ability to deal with

1  Southcentral.

2          THE COURT:  Thank you, Mr. Torgerson.

3          MR. FRAM:  Your Honor, could I just do three points in

4  rebuttal?  I promise those will be the last three points.

5          THE COURT:  Last three points.

6          MR. FRAM:  Okay.

7          THE COURT:  Madam clerk is about to throw something at

8  me.

9          MR. FRAM:  The idea that Southcentral's designated

10  director could provide the information to the Court so that the

11  Court could make a decision, that wouldn't work.

12  Southcentral's designated director can't even share that

13  information with me.  So I don't know how as a practical matter

14  it gets to the Court.  And two, she might not even have it,

15  because some of the documents might have been shared through

16  what ANTHC calls strict document security measures.  Which is

17  through a secured portal, but she doesn't get a copy.

18          Second, there's no allegation here that the conflict

19  rule -- that Southcentral is not diligently applying the

20  conflict rules or that any of the information sought here would

21  be subject to any of those conflict rules.

22          And third, just as a factual matter, Section 5 here

23  was implemented before Judge Burgess's order.  So that was -- I

24  think it was August 2021.  Judge Burgess's order was July 2022.

25  So just as a factual matter that policy that contains the

         offending provision preceded the order to ANTHC to change any
         policy that had this provision.  Thank you.
                  THE COURT:  Thank you.
                  Well, Madam Clerk, I kept a 40-minute oral argument to
         an hour and a half.  Getting better.
                  Well, look, I very much appreciate the conversation
         today.  I found it informative and helpful.  The briefing also
         has been excellent.  If at not times a little bit snarky, but I
         also enjoy that as well.
                  Thank you very much for your time.  And Madam Clerk --
         hold on.  Before I do -- see, I was about to forgot.  There was
         a couple housekeeping, just to clean up the document.  There
         was a motion to seal at Docket 398 that the Court will grant.
         And then the motion for leave to file a sur reply.  Again, at
         this point in time, the Court will go ahead and grant that as
         well.  So that was Docket 398 and 400.
                  Now, Madam Clerk, we may go off record.
                  MR. TORGERSON:  Your Honor, just to be clear, so the
         motion to strike at 389, I'm not sure if we received a ruling
         on that.
                  THE COURT:  We didn't miss it.  I think we're going to
         incorporate that into our broader decision.
                  MR. TORGERSON:  Okay.  Thank you.
                  THE COURT:  Anything else?
                  (No audible response.)

1        THE COURT:  All right.  Madam Clerk, we may go off

2   record.

3        DEPUTY CLERK:  All rise.  This matter is now

4   adjourned.  This Court now stands adjourned subject to call.

5        (Whereupon, the Court adjourned at 2:33 p.m.)

6                        --oo0oo--

7                        CERTIFICATE

8       I, Stacy M. Baldwin, Federal Official Court Reporter in and
    for the United States District Court of the District of Alaska,
9   do hereby certify that the foregoing transcript is a true and
    accurate transcript from the original stenographic record in
10  the above-entitled matter and that the transcript page format
    is in conformance with the regulations of the Judicial
11  Conference of the United States.

12      Dated January 16, 2024.

13

14                            /s/ Stacy M. Baldwin
                            STACY M. BALDWIN, RCR, RMR
15                          FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25